# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

Case No. 17-22197-MC-TORRES

IN THE MATTER OF THE
EXTRADITION OF RICARDO
ALBERTO MARTINELLI BERROCAL

_____/

## ORDER ON MOTIONS RELATED TO RELEASE ON BAIL

Some time ago a scholarly work in the Nation's leading law journal foretold that extradition law would become a more important part of the United States legal experience, pointing to "[t]he multi-country transactions of the contemporary world economy, the clash of late-twentieth-century governmental ideologies, the ease and speed of modern travel, and the steady increase in prosecutions for complex economic crimes . . . . " J. Kester, *Some Myths of United States Extradition Law,* 76 Geo. L.J. 1441, 1443 (1988).  That forecast has undoubtedly proven to be true as illustrated by this particular case.

This case involves an extradition request by the Republic of Panama, approved by the United States Department of State, for the arrest and extradition of Ricardo Alberto Martinelli Berrocal – the former President of Panama.  The Supreme Court of Panama has requested extradition on the grounds of alleged violations of Panamanian law that occurred while President Martinelli was in office.  President Martinelli, who is admittedly quite wealthy and who has commercial interests in many countries, left Panama and traveled to the United States where

he filed an application for asylum in 2015. While that application remains pending, the Department of State and the United States Attorneys' Office here in Miami have now filed the pending action to authorize his detention and his extradition to Panama pursuant to multiple treaties between the United States and Panama. The immediate matter pending before the Court arises from the United States' Motion for Detention of Defendant Ricardo Alberto Martinelli Berrocal [D.E. 15] as well as Defendant's corresponding Motion For Release on Bail. [D.E. 18].

Contrary to the author's desire that extradition law be modernized through Congressional review and reform, the law that governs extradition today has largely remained rooted in the same principles handed down by the Supreme Court at the turn of the twentieth century.[1] And unfortunately for President Martinelli, one of those firmly-rooted principles is that the power to grant bail in extradition cases "should be exercised only in the most pressing circumstances, and when the requirements of justice are absolutely peremptory . . . ." *In re Mitchell,* 171 F. 289, 289 (S.D.N.Y. 1909) (Hand, J.).

In exercising the jurisdiction that we are charged with enforcing, and though this case is at its infancy, the Court has reviewed the entire available record to determine if the requirements of justice warrant the rare exercise of the power to grant bail. Though the circumstances involved are indeed extraordinary, and

---

[1]     *Id*. at 1442. ("Case law is accumulating, based on interpretations of antiquated Supreme Court decisions that date mostly from the four decades that straddle the turn of the twentieth century—an era when constitutional safeguards of criminal procedure were undeveloped and meager, and due process of law meant something less than it does today.").

though the Defendant has made a strong case for the grant of bail as a former head of state of an American ally like the Republic of Panama, bail cannot be granted. We conclude instead that the need to enforce our Nation's treaty obligations, as well as the preservation of our leadership role in the proper administration of justice, require that we follow the general rule and Order the Defendant detained while the extradition process is completed. To paraphrase what our Circuit concluded over fifty years ago in an extradition case involving another former head of state, "[n]o amount of money could answer the damage that would be sustained by the United States were the appellant to be released on bond, flee the jurisdiction, and be unavailable for surrender, if so determined. The obligation of this country under its treaty with [Panama] is of paramount importance." *Jimenez v. Aristiguieta,* 314 F.2d 649, 653 (5th Cir. 1963) (affirming revocation of bond for extradition to Venezuela of former head of military junta charged with corruption).

President Martinelli is, of course, free to waive any further extradition proceedings here and return to Panama expeditiously where he can again seek bail. Or he can elect to avail himself of all the limited process he is entitled to under our law in an effort to stave off extradition. In deference to him, the Court is prepared to expedite either process to the extent possible. But this is not a criminal case where bail would ordinarily be granted. This is an administrative proceeding arising under international law for certification and approval of the State Department's decision to extradite this person at the request of a foreign government. *See* 18 U.S.C. § 3184. Our law presumes that the Court will commit

the Defendant in custody "until such surrender shall be made."  *Id.*  We intend to do just that. *See Abbott v. Abbott,* 560 U.S. 1, 20 (2010) ("International law serves a high purpose when it underwrites the determination by nations to rely upon their domestic courts to enforce just laws by legitimate and fair proceedings.").

## I. BACKGROUND

### A. *Panama's Request for Extradition*

This case concerns the potential extradition of the former President of the Republic of Panama, Ricardo Alberto Martinelli Berrocal ("Pres. Martinelli") from the United States to Panama.  On October 9, 2015, "Harry Diaz, a Justice of the Criminal Chamber of the Supreme Court of Justice of the Republic of Panama, issued an indictment against" Pres. Martinelli for four offenses.  [D.E. 1 at 2].

> Martinelli Berrocal is charged with (1) interception of telecommunications without judicial authorization, in violation of Article 167 of the Criminal Code of Panama; (2) tracking, persecution, and surveillance without judicial authorization, in violation of Article 168 of the same code; (3) embezzlement by theft and misappropriation, in violation of Article 338 of the same code; and (4) embezzlement of use, in violation of Article 341 of the same code.

*Id.* at 1-2.

"After Martinelli Berrocal failed to appear in court when summoned for a hearing on the charges, on December 21, 2015, the Supreme Court of Justice issued an order for Martinelli Berrocal's arrest."  *Id.* at 2; [D.E. 12-3 at 3].  In Panama's "Request for Extradition and Arrest for Purposes of Extradition of Martinelli Berrocal," Jerónimo E. Mejía Edward, a Justice of the Supreme Court of Justice of Panama and *El Magistrado de Garantías*, requested Pres. Martinelli's

arrest for purposes of extradition to the Republic of Panama . . . based on the provisional detention order issued on December 21, 2015 by the Supreme Court of Justice of Panama, in which the Court also empowered the undersigned, who is *El Magistrado de Garantías* appointed to case number 138-15, to take steps to fulfill the provisional detention of Ricardo Alberto Martinelli Berrocal . . . . The provisional detention ordered by the Supreme Court of Justice remains valid and executable to apprehend [Mr.] Martinelli Berrocal.[2]

[D.E. 13-1 at 30, 3-4, ¶ 2].

*El Magistrado de Garantías* is a Justice of the Supreme Court of Panama who, as a pretrial judge, controls the investigative activities during a special proceeding. *Id.* at 6, ¶ 7. *El Magistrado Fiscal* is a Justice of the Supreme Court of Panama who is empowered as a Prosecutor and is entitled to conduct the investigation during a special proceeding. *Id.* Panama's request for Pres. Martinelli's extradition is a special proceeding under Panamanian law. *Id.* at 5, ¶ 5.

### B.     *Background on Pres. Martinelli*

In 2009, Pres. Martinelli was elected as President of Panama, and the current President, Juan Carlos Varela, was his vice-president. [D.E. 18 at 2-3]. According to Pres. Martinelli, immediately upon President Varela's election to the presidency in 2014, "President Varela launched numerous criminal investigations into Pres. Martinelli." *Id.* at 3. Specifically:

Due to President Varela's actions, in February 2015, President Martinelli traveled to the United States, and on July 15, 2015, he filed his asylum application, providing the government with his home address and fingerprints. In his asylum application, President

---

[2]     The statute of limitations for the crimes for which Pres. Martinelli was charged has not expired. [*See* D.E. 13-1 at 28-29, ¶ 32-35].

Martinelli openly discussed, in detail, the pending investigations against him, including the investigations into his alleged misuse of government equipment to wiretap and surveil political opponents and members of the Panamanian government. President Martinelli unequivocally denied any involvement in illegal activities. He had his asylum interview with the Department of Homeland Security on March 16, 2017.

*Id.* at 4.

The government has focused on Pres. Martinelli's reported wealth throughout these proceedings. [D.E. 15 at 20]. In particular:

According to media reports, Martinelli is an extraordinarily wealthy man who owns his own plane, two helicopters, and a yacht. Martinelli Berrocal reportedly owns numerous companies, including the Super 99 supermarket chain in Panama, which generates over $700 million dollars' worth of revenue annually. Martinelli Berrocal is also the owner of several other companies based in Panama, including a media conglomerate called NexTV, S.A.

*Id.* (internal citations omitted).

Yet, Pres. Martinelli has disputed some of the statements that the government made regarding his holdings during his detention hearing, which was held on Tuesday, June 20, 2017. [D.E. 27; D.E. 34]. According to Pres. Martinelli, the government implied at the hearing that he "was attempting to hide ownership of his plane." [D.E. 34 at 1]. As it turned out:

The plane has a U.S. tail number (N799RM). Under FAA regulations, a plane owned by a foreign individual or corporation may only maintain a U.S. tail number if it is held under a U.S. trustee. Registering such a plane under a U.S. trustee is common aviation practice in the United States. Further, only the United States has jurisdiction to impound a plane with a U.S. tail number. Therefore, [Pres. Martinelli 's] registration of the plane under a U.S. Trustee to maintain a U.S. tail number enhances the ability of the government to impound his plane.

*Id.* Further, Pres. Martinelli clarified statements made regarding his business interests:

> The government represented that [Mr.] Martinelli [Berrocal] owned or had control over a bank called Global Bank. In 2015, [Mr.] Martinelli [Berrocal] transferred his six and a half (6.5%) interest in Global Bank to his wife who currently maintains a thirteen (13%) interest in the bank. Although [Mr.] Martinelli [Berrocal] and his wife were once on the bank's board of directors, the bank removed them from the board shortly after he took office in Panama in 2009.

*Id.* at 2.

It cannot be disputed, however, that Pres. Martinelli has substantial ties to many other countries, both personally and for his commercial interests. [*See* D.E. 18 at 18; D.E. 15 at 21; D.E. 34 at 2]. Pres. Martinelli may be licensed to drive in the Dominican Republic, but this point remains unclear. [D.E. 34 at 2]. "In addition, [Mr.] Martinelli Berrocal is also a citizen of Italy, and has travelled at least once to the United States using his Italian passport instead of his Panamanian one." [D.E. 15 at 21]. Pres. Martinelli has not disputed his Italian citizenship, but has stated that "[a]lthough he is a citizen of Italy, he is seeking asylum from that country as well . . . ." [D.E. 18 at 18]. This asylum petition apparently relates to some type of covert assistance he once provided to the United States. Ironically, that assistance was not welcomed by Italian authorities. [D.E. 35 at 59:13].

**C.** **_The Charges Against Pres. Martinelli_**

Justice Mejía Edward listed the charges that _El Magistrado Fiscal_ intends to prove against Pres. Martinelli. [D.E. 13-1 at 15-25, ¶ 27]. According to the charges, Pres. Martinelli:

> established an organized apparatus of power acting beyond the Social and Democratic State of Law, and through this apparatus of power instructions were given to officers of The National Security Council, who were fully aware of the illegality of these activities and without a judicial authorization undertook interceptions of electronic communications in various forms, surveillance and tracking of people, which they called targets, who belong to difference political, economic, civic groups and unions of the country, extending this systematic violation of human rights, in some cases, to family and friends of individuals subject to interceptions, surveillance and tracking; and that in order to achieve these activities outside the Constitution and the Law, the organization of State power led by Ricardo Alberto Martinelli Berrocal supplied the equipment, resources, and personnel necessary to achieve the aforesaid illicit activities, using State funds.

_Id._ at 15-16, ¶ 27(b). These alleged crimes occurred between 2012 and mid-May 2014. _Id._ at 16, ¶ 27(c). According to the government, "[a]n audit conducted by the Comptroller General concluded that the loss to the state sustained as a result of the purchase and disappearance of the surveillance equipment amounted to US $ 10,861,857.48." [D.E. 15 at 6].

The first alleged crime for which Panama requests Pres. Martinelli's extradition is the:

> _Crime against the inviolability of secret and the right to privacy_ (Interception of private telecommunications without judicial authority), provided under Article 167, Title II, Chapter II of the Second Book of The Panamanian Criminal Code, reading as follows:
>
> Article 167. Whoever, without the authorization of the judicial authority, intercepts telecommunications or uses technical devices for

listening, transmission, recording, or reproducing conversations that are not for the public shall be punished from two to four years in prison.

[D.E. 13-1 at 26-27, ¶ 31(a)] (internal quotation marks omitted).

The second alleged crime for which Panama requests Pres. Martinelli's extradition is the:

> *Crime against the inviolability of secret and the right to privacy* (Tracking, Persecution and Surveillance without judicial authority), provided under Article 168, Title II, Chapter III of the Second Book of The Panamanian Criminal Code, reading as follows:
>
> Article 168. Whoever, without proper authorization, practices tracking, persecution, or surveillance against a person, for illicit purposes, shall be punished from two to four years in prison. The same punishment is imposed on anyone who sponsors or promotes these facts.

*Id.* at 27, ¶ 31(b) (internal quotation marks omitted).

The third alleged crime for which Panama requests Pres. Martinelli's extradition is the:

> *Crime against the public administration*, Different Kinds of Embezzlement (embezzlement by theft or misappropriation), provided under Article 338, Title X, Chapter I of the Second Book of The Panamanian Criminal Code, reading as follows:
>
> Article 338. A public officer who takes or embezzles in any way, or consents that somebody else appropriates, takes or embezzles any form of money, securities or property which administration, collection or custody have been entrusted by virtue of his position, shall be punished from four to ten years in prison.
>
> If the amount of the appropriated exceeds the sum of one hundred thousand dollars (US$100,000.00) or the money, securities or appropriate goods were intended for welfare purposes or for development programs or social support, the punishment shall be from eight to fifteen years in prison.

*Id.* at 27, ¶ 31(c) (internal quotation marks omitted).

The fourth and final alleged crime for which Panama requests Pres. Martinelli's extradition is the:

> *Crime against the public administration*, different kinds of embezzlement (embezzlement of use), provided under Article 341, Title X, Chapter I of the Second Book of the Panamanian Criminal Code, reading as follows:
>
> Article 341. A public officer who, for purposes other than service, uses in his own or another's benefit, or allows somebody else to use money, securities or property under his charge by reasons of his duties or which are in his custody, shall be punished from one to three years in prison, or its equivalent in daily fines or weekend arrest.
>
> The same punishment shall be applied to the public officer that uses official works or services for his benefit or allows someone else to do it.

*Id.* at 27-28, ¶ 31(d) (internal quotation marks omitted).

### D.    *The Relevant Treaties*

Panama formalized its extradition request "pursuant to the Extradition Treaty between the United States of America and the Republic of Panama, signed on May 25, 1904, which entered into force for the United States of America on May 8, 1905, and for the Republic of Panama on April 8, 1905 . . . ." *Id.* at 3, ¶ 1. This treaty provides:

> The Government of the United States and the Government of the Republic of Panamá mutually agree to deliver up persons who, having been charged with or convicted of any of the crimes and offenses specified in the following article, committed within the jurisdiction of one of the contracting parties, shall seek an asylum or be found within the territories of the other: Provided, that this shall only be done upon such evidence of Criminality as, according to the laws of the place where the fugitive or person so charged shall be found, would justify his or her apprehension and commitment for trial if the crime or offense had been there committed.

Treaty Between the United States of America and the Republic of Panama Providing for the Extradition of Criminals, Pan-U.S., art. I, May 25, 1904, 34 Stat. 2851 (Treaty); [D.E. 12-1 at 3].

Relevant to this case, the treaty provides that the signatories shall grant extradition for "[e]mbezzlement by public officers; embezzlement by persons hired or salaried, to the detriment of their employers; where in either class of cases the embezzlement exceeds the sum of two hundred dollars; larceny." Treaty at art. II; [D.E. 12-1 at 4]. Further, the treaty states that "if the fugitive is merely charged with a crime, a duly authenticated copy of the warrant of arrest in the country where the crime has been committed, and of the depositions or other evidence upon which such warrant was issued, shall be produced." Treaty at art. III; [D.E. 12-1 at 5]. The final relevant article from this treaty states:

> A fugitive criminal shall not be surrendered if the offense in respect of which his surrender is demanded be of a political character, or if he proves that the requisition for his surrender has, in fact, been made with a view to try or punish him for an offense of a political character. No person surrendered by either of the high contracting parties to the other shall be triable or tried, or be punished, for any political crime or offense, or for any act connected therewith, committed previously to his extradition. If any question shall arise as to whether a case comes within the provisions of this article, the decision of the authorities of the government on which the demand for surrender is made, or which may have granted the extradition, shall be final.

Treaty at art. VI; [D.E. 12-1 at 5].

In addition to this 1904 treaty, the government relies on two more recent treaties in its Complaint: the Convention on Cybercrime and the U.N. Convention

Against Corruption. [D.E. 1 at 1]. According to the Convention on Cybercrime, a

multilateral treaty to which the United States and Panama are both parties:

> Each Party shall adopt such legislative and other measures as may be necessary to establish as criminal offences under its domestic law, when committed intentionally, the interception without right, made by technical means, of non-public transmissions of computer data to, from or within a computer system, including electromagnetic emissions from a computer system carrying such computer data. A Party may require that the offence be committed with dishonest intent, or in relation to a computer system that is connected to another computer system.

Convention on Cybercrime art. 3, Nov. 23, 2001, T.I.A.S. No. 13174. The treaty

expressly includes an article on extradition, quite relevant here, which provides:

> This article applies to extradition between Parties for the criminal offences established in accordance with Articles 2 through 11 of this Convention, provided that they are punishable under the laws of both Parties concerned by deprivation of liberty for a maximum period of at least one year, or by a more severe penalty. [24(1)(a)]

> The criminal offences described in paragraph 1 of this article shall be deemed to be included as extraditable offences in any extradition treaty existing between or among the Parties. The Parties undertake to include such offences as extraditable offences in any extradition treaty to be concluded between or among them. [24(2)]

*Id*. at art. 24(1)(a), 24(2).

The final treaty cited by the government is the U.N. Convention Against

Corruption, another multilateral treaty to which the United States and Panama are

both parties, that provides:

> Embezzlement, misappropriation or other diversion of property by a public official

> Each State Party shall adopt such legislative and other measures as may be necessary to establish as criminal offences, when committed intentionally, the embezzlement, misappropriation or other diversion by a public official for his or her benefit or for the benefit of another

person or entity, of any property, public or private funds or securities or any other thing of value entrusted to the public official by virtue of his or her position.

U.N. Convention Against Corruption art. 17, Oct. 23, 2003, S. Treaty Doc. No. 109-6. The treaty also includes an express provision relating to extradition, which provides:

This article shall apply to the offences established in accordance with this Convention where the person who is the subject of the request for extradition is present in the territory of the requested State Party, provided that the offence for which extradition is sought is punishable under the domestic law of both the requesting State Party and the requested State Party. [1]

Notwithstanding the provisions of paragraph 1 of this article, a State Party whose law so permits may grant the extradition of a person for any of the offences covered by this Convention that are not punishable under its own domestic law. [2]

Each of the offences to which this article applies shall be deemed to be included as an extraditable offence in any extradition treaty existing between States Parties. States Parties undertake to include such offences as extraditable offences in every extradition treaty to be concluded between them. A State Party whose law so permits, in case it uses this Convention as the basis for extradition, shall not consider any of the offences established in accordance with this Convention to be a political offence. [4]

*Id.* at art. 44(1), 44(2), 44(4), Oct. 23, 2003, S. Treaty Doc. No. 109-6.

### E.     *Procedural History*

The government filed its complaint against Pres. Martinelli on Monday, June 12, 2017.  [D.E. 1 at 9].  On Friday, June 16, 2017, Pres. Martinelli moved, "on an emergency basis, to dismiss the extradition complaint and to be discharged from custody immediately . . . ."  [D.E. 12 at 1].  To support this motion, he asserted that

Contempt or failure to appear is ***not*** an extraditable offense under the Treaty. Treaty art. II (listing thirteen enumerated offenses, none of which include contempt). In other words, Panama has not issued an arrest warrant because it believes it has probable cause to arrest [Mr.] Martinelli [Berrocal] for the alleged offenses; it has merely ordered his detention on procedural grounds for 'contempt' based on failure to appear, something that is not even an offense under the Criminal Code of Panama.

*Id.* at 2 (emphasis in original). On Monday, June 19, 2017, Pres. Martinelli then moved for release on bail based on the presence of seven special circumstances and the absence of a risk of flight. [D.E. 18 at 1-2, 7-21].

### F. *Disputes Regarding Allegations and Underlying Law*

Pres. Martinelli has disputed both the allegations surrounding his potential extradition as well as the law on which the extradition is based. [*See, e.g.*, D.E. 18-2 at 13, 120-23; D.E. 12 at 1-3; D.E. 18 at 1-2, 7-21]. Regarding Pres. Martinelli's potential immunity for his alleged crimes, he cited the Constitution of the Republic of Panama:

**Article 191.** The President and the Vice-President of the Republic are responsible only in the following cases:

1. For exceeding their constitutional powers;
2. For acts of violence or coercion during the electoral process; for impeding the meeting of the National Assembly, for blocking the exercise of its functions or of the functions of the other public organizations or authorities that are established by this Constitution;
3. For offenses against the international personality of the State or against the public administration.

In the first and second case, the penalty shall be removal from office, and disqualification to hold public office for a period fixed by law. In the third case ordinary law shall apply.

[D.E. 18-2 at 13]. Based on this article, Pres. Martinelli argued that he "generally has immunity for crimes committed during his presidency." [D.E. 18 at 9]. He claimed that this article "clearly applies to the 'wiretapping' crimes charged here (i.e., interception of telecommunications/surveillance without authorization)." *Id*. He continued to assert that "as a member of the Central American Parliament, [he] has 'Parlecen' immunity that precludes him from being charged for any crime." *Id*.

As for the allegations themselves, Pres. Martinelli has denied them in their entirety.[D.E. 18 at 6].According to Pres. Martinelli, an affidavit from Ismael Pitti, on which the government principally relies:

> was executed on the basis of "information and belief" and reeks of rank hearsay, as Pitti does not identify a single personal interaction with [Mr.] Martinelli [Berrocal]. The Panamanian government has bought and paid [Mr. Pitti] as a witness, providing him with a well-paid job in Washington, D.C., despite his alleged participation in the alleged offenses.

*Id*.[3] Pres. Martinelli points instead to a competing affidavit executed by Ronny Rodriguez Mendoza, a former aide to Pres. Martinelli. *See id.* at 6, 9. Of note, Mr. Rodriguez Mendoza's affidavit states that National Police Directorate Commissioner Rolando Lopez:

> offered to take [him] directly to the Office of the President of the Republic, to Mr. JUAN CARLOS VARELA, who was willing to offer [him] "WHATEVER [HE] WANTED" if [he] would incriminate former President RICARDO MARTINELLI, and that [the National Police Directorate], in January 2015, had seized the Office of the Procurator General of the Nation, and that [he] could testify as a "protected witness". [He] maintained that [he] would no [sic] do so. A few days later, ROLANDO LOPEZ PEREZ called [him] again, but this time in

---

[3]    The two copies provided of Mr. Pitti's affidavit were scanned poorly and are difficult to read. [*See* D.E. 18-2 at 104-17; D.E. 36-7].

order to threaten and intimidate [him]. The conversation ended with these words: "we're going to cancel your retirement, we're going to open 3 criminal dockets against you, we're going to remove you from the National Police, we're going to throw you in jail, and you won't last a week at La Joya".

[D.E. 18-2 at 121].

Finally, Pres. Martinelli addressed the enforceability of the detention order issued against him. [D.E. 28 at 1]. "[T]he arrest warrant issued for President Martinelli is unprecedented in Panama and null and void because the issuing court lacked jurisdiction over him." *Id.* To support this statement, Pres. Martinelli provided an affidavit from Roberto J. Moreno. [D.E. 28-2]. Mr. Moreno is a Panamanian lawyer and in 2009 he "obtained a Masters in Law (LL.M.) with a specialization in International Human Rights, in the United States of America in the prestigious American University Washington College of Law, Washington D.C., thanks to a Fulbright Scholarship from the State Departament [sic] of the United States of America . . . ." [D.E. 24-2 at 1]. Mr. Moreno concluded his affidavit by stating:

> that based on the norms and the precedents that: (1) Due the absence of indictment of [Mr.] Martinelli Berrocal, the Order of Detention against him is nullified; (2) That in order to acquire jurisdiction and the power to apply personal precautionary measures against [Mr.] Martinelli [Berrocal], his previous personal indictment is indispensable ; (3) That in order to be able to order a detention due to contempt, a previous indictment hearing is required, which has not occurred in the case of [Mr.] Martinelli Berrocal, violating due process and the fundamental guarantees of Mr. Martinelli [Berrocal].

[D.E. 28-2 at 4, ¶ 13].

Pres. Martinelli has also tackled the specific charges to undermine the strength of the case against him. He argues that the weak and impeachable evidence presented justifies bail pending final adjudication of the extradition process. [D.E. 36]. For instance, in his supplemental memorandum in support of his Motion for Release, Pres. Martinelli highlighted contradictions or inconsistencies between Prosecutor Diaz's extradition affidavit and the supporting documentation that Diaz relied upon. It turns out that the surveillance system that his affidavit cited as evidence of Pres. Martinelli's embezzlement of Panamanian funds was not the surveillance system that Ismael Pitti described in his affidavit. [*Id*. at 11-12]. So, Pres. Martinelli concludes, there is a material disconnect between the charge of embezzlement of funds and the sworn evidence provided to sustain that charge. And that disconnect purportedly undermines the case for extradition under the 1904 Treaty or the Convention of Cybercrime.

The record also shows, however, that the allegations cited in the Prosecutor's affidavit implicate *both* surveillance systems described in Pres. Martinelli's supplemental memorandum, in part based on allegations that the illegal surveillance involved email communications, "Whatsapp" communications (a communications applications on mobile devices), as well as wireless cellular communications. [D.E. 13-1 at 8]. If in fact the evidence supports the charge of email or Whatsapp interceptions, which would have required use of the "MLM Protection" system that Panamanian funds paid for, the case for extradition may prove to be sound under both the 1904 Treaty and, at least, the Convention on

Cybercrime. And this may be the case even though Pres. Martinelli's efforts to undermine the reliability of the Prosecutor's affidavit and evidence may be well taken.

In any event, these and other issues are now hotly contested in this extradition case, which may require further factual and record development. We do not decide them now other than to highlight for purposes of this Order the issues that are at stake in connection with Pres. Martinelli's request for bond.

## II. ANALYSIS

### A. <u>*Well-Established Presumption Against Bail*</u>

We begin by recognizing that the federal extradition statute provides no explicit authority for a district court to grant bail to a potential extraditee. *See* 18 U.S.C. § 3184. Certainly, the Eighth Amendment does not speak to this issue, and neither does the Bail Reform Act. *See* 18 U.S.C. § 3142 (creating a detailed procedural scheme for making bail determinations in domestic criminal cases but omitting any reference to extradition proceedings). Furthermore, the extradition treaty at issue between the United States and the Republic of Panama does not grant a right to bail, does not outline bail procedures, and does not even make any mention of bail. Arguably, therefore, Defendant's request for bond pending final adjudication of the extradition petition filed in this case has no constitutional or statutory support.

It is true, however, that federal common law that dates back to the early twentieth century has largely been relied upon to fill in the gap of authority relating

to this issue.  In its only known or cited opinion tackling this subject, *Wright v. Henkel,* the Supreme Court recognized for the first time in 1903 that a court had the power to grant bail in international extradition cases.  *See* 190 U.S. 40, 63 (1903). The Court ruled that "while bail should not ordinarily be granted in cases of foreign extradition," it was also not holding that courts, "may not in any case, and whatever the special circumstances, extend the relief."  *Id.*

For over a hundred years following this ruling, circuit and district courts have thus applied the "special circumstances" test for bail determinations in extradition cases.  *See, e.g., Jimenez,* 314 F.2d at 653 (applying special circumstances analysis under *Wright* in affirming denial of bail); *see also United States v. Kin-Hong,* 83 F.3d 523, 524 (1st Cir. 1996) ("Special circumstances" are limited to situations in which "'the justification [for release] is pressing as well as plain.'") (quoting in part *In re Klein,* 46 F.2d 85, 85 (S.D.N.Y. 1930)); *Kamrin v. United States,* 725 F.2d 1225, 1228 (9th Cir. 1984) ("'[S]pecial circumstances' requirement creates standard for extradition cases different from that for federal criminal cases"); *United States v. Leitner,* 784 F.2d 159 (2d Cir. 1986) (applying special circumstances test in affirming denial of bail); *In re Extradition of Russell,* 805 F.2d 1215, 1216 (5th Cir. 1986) (same); *Beaulieu v. Hartigan,* 554 F.2d 1, 1-2 (1st Cir. 1977) (conducting special circumstances analysis in vacating district court order granting bail).

Courts in our own circuit have regularly applied this presumption.  "[A] defendant in an extradition case will be released on bail only if he can prove "special

circumstances." *Martin v. Warden, Atlanta Pen,* 993 F.2d 824, 827 (11th Cir. 1993) (quoting *Wright,*190 U.S. at 63, and also citing *In re Extradition of Ghandtchi,* 697 F.2d 1037, 1038 (11th Cir. 1983)); *see, e.g., In re Extradition of Shaw,* 2015 WL 521183, *5 (S.D. Fla. Feb. 6, 2015); *In re Extradition of Pelletier,* 2009 WL 3837660, *3(S.D. Fla. Nov. 16, 2009); *In re Extradition of Stern,* 2007 WL 3171362, *5 (S.D. Fla. Oct. 25, 2007).

The rationale for this well-established presumption was persuasively explained by Magistrate Judge Hacker:

> The government's strong interest in denying bail stems from its need to ensure that the United States fulfills its international treaty obligations . . . . This is because extradition treaties create a binding obligation on the United States government to surrender fugitives to its treaty partners once they are found to be extraditable . . . If a foreign fugitive was released by the United States and absconded pending extradition, the government would suffer serious embarrassment, and this could create potential reciprocal noncompliance by other countries . . . The "paramount importance" of an extradition treaty supports denials of bail in foreign extradition cases. *See Jimenez v. Aristiguieta,* 314 F.2d 649, 653 (5th Cir. 1963). *The special circumstances test was established to allow for a limited number of cases to be eligible for bail because any risk of flight is too significant a risk for the national interest to tolerate.*

*In re Extradition of Garcia,* 761 F. Supp. 2d 468, 470-71 (S.D. Tex. 2010) (emphasis added) (other citations and quotations omitted).

Notably, this cogent explanation relied upon our Circuit's binding authority in *Jimenez,* a case that also dealt with the extradition of a foreign head of state. *See* 314 F.2d at 649-50. In that case, Venezuela sought the extradition of a former President, and leader of a military junta, that ruled Venezuela from 1948 through 1958. *See* 311 F.2d 547, 552 (5th Cir 1962) (first appeal of extradition order on

habeas review, affirming extradition because reasonable grounds existed to charge former President with financial crimes committed during term of office). After fleeing Venezuela for the shores of Miami, the former President was charged in his home country for accessory to murder and financial crimes. *Id*. In a second appeal filed by the extradited former President, 314 F.2d at 649, the Fifth Circuit held that the district court's ultimate decision to deny bail was sound because:

> Congress has provided that upon the extradition magistrate's certification to the Secretary of State of his finding of probable cause, the magistrate 'shall issue his warrant for the commitment of the person so charged to the proper jail, there to remain until such surrender shall be made.' 18 U.S.C. § 3184. . . . He has not shown special reasons justifying this court in releasing him on bail. On the contrary, all of the relevant facts and circumstances existing at this time, . . . all lead to the conclusion that the more reasonable and proper course is to deny appellant further release on bail.
>
> ***
>
> *No amount of money could answer the damage that would be sustained by the United States were the appellant to be released on bond, flee the jurisdiction, and be unavailable for surrender, if so determined. The obligation of this country under its treaty with Venezuela is of paramount importance.*

*Jimenez,* 314 F.2d at 652-63 (emphasis added; citations omitted).

One strong overriding concern that the Court has in addressing the topic of bail here is that any release of a detainee awaiting extradition is largely antithetical to the entire process. That is because the concept of bail is only relevant in our criminal justice system based on its incentive to appear in court for fear of the penalty that would befall the defendant, and likely his family, if he fled. The adjudicating jurisdiction in that case would get some compensation for the

defendant's flight, and its "pound of flesh" so to speak, through executing on the bond or collateral. How is that carrot and stick approach relevant to a proceeding in a foreign jurisdiction? It really is not because any bond or collateral forfeited from an extraditee's flight would not, as a practical matter, flow to the foreign state or remedy that state's continued inability to adjudicate its wanted defendant. *See Wright,* 190 U.S. at 62 ("The enforcement of the bond, if forfeited, would hardly meet the international demand; and the regaining of the custody of the accused obviously would be surrounded with serious embarrassment.").

A District Judge sitting in New York aptly described this "absurd" dilemma in denying bond to a defendant charged with crimes in Great Britain:

> Yet even then it is not easy for me to conceive of circumstances that should move the court to admit to bail and not to dismiss the proceeding. In other words, admission to bail and extradition should be in practice an unusual and extraordinary thing, for the whole proceeding is opposed to our historical ideas about bail. Bail is taken in all our courts on the theory of punishing, if not the accused, at least his friends, in the event of his absconding; but there the party seeking to inflict punishment is the commonwealth – state or national. Persons accused of crime in foreign lands have not, presumably, violated the laws of this country; it is therefore absurd for our state or nation to collect money from the friends of the accused. If the bail, however, be so drawn as to cause the money collected on forfeiture to flow to the demanding government, the situation from an international viewpoint is ridiculous, if not insulting.

*U.S. ex rel. McNamara v. Henkel,* 46 F.2d 84, 84-85 (S.D.N.Y. 1912).

Frankly, it is hard to argue with that logic. Contemplating bail in any extradition case seems to fly in the face of the court's limited jurisdiction under 18 U.S.C. § 3184. And it is in effect an attempt at fitting a square peg into a round hole. But charged as we are to also apply the Supreme Court's current doctrine

granting us some limited power to grant bail even in an extradition case, we proceed to the task of looking for special circumstances in this case. Arguably there is one – and only one – special circumstance here arising from Pres. Martinelli's unique status as a former head of state that is now seeking asylum in this country. But even assuming that qualified as a special circumstance under *Wright,* as we explain below, we still cannot grant the request to release this Defendant based upon the overwhelming risk of flight that is present in this record.

## B. *There are no Traditional Special Circumstances in this Record that Warrant Bail.*

### 1. *Pres. Martinelli Has Not Raised Numerous Claims with a High Probability of Success.*

Pres. Martinelli's first proposed special circumstance is that he has numerous claims with a high probability of success. [D.E. 18 at 8]. He divided this proposed special circumstance into six circumstances. *Id*. at 8-14. This Court will refer to those circumstances as "sub-circumstances."

Pres. Martinelli's first proposed special sub-circumstance is that the charges against him are not supported by probable cause. [D.E. 18 at 8-9]. "[T]he probable cause standard applicable in extradition proceedings is identical to that used by courts in federal preliminary hearings. The burden of the government is to offer evidence that would support a reasonable belief that [the defendant] was guilty of the crime charged. The probable cause standard applicable in extradition proceedings has been described as evidence sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of the

accused's guilt." *Sidali v. INS*, 107 F.3d 191, 199 (3d Cir. 1997) (alteration in original) (internal quotations and citations omitted).

Like Pres. Martinelli, the defendant in *In re Extradition of Beresford-Redman* argued "that the United States's lack of probable cause should be considered a 'special circumstance' favoring bail." 753 F. Supp. 2d 1078, 1090 (C.D. Cal. 2010). The defendant contended "that the showing of probable cause in the provisional arrest warrant was defective because the allegations were made by an Assistant United States Attorney on nothing more than information and belief." *Id.* (internal quotation and citations omitted). Yet, in responding to the defendant's argument, the court held to the contrary:

> The detailed factual allegations in the Complaint, if true and unrebutted, do not suggest a weak case against Beresford-Redman. The Mexican authorities issued an arrest warrant for Beresford-Redman in May 2010, shortly after the April death of his wife, in contrast to the more than three-year delay of the Hungarian authorities in pursuing Molnar. Unlike [*In re Extradition of Molnar*, 182 F. Supp. 2d 684 (N.D. Ill. 2002)], the Mexican authorities have not "dropped" the charges against Beresford-Redman, but are actively pursuing these charges. In sum, the *Molnar* decision does not compel the award of bail here. The Court rejects Beresford-Redman's contention that the provisional arrest complaint or the quality of the evidence underlying that complaint should qualify as a special circumstance in favor of bail.

*Id.* at 1091.

We agree that these types of challenges to the underlying extradition request hardly constitute the type of special circumstances that warrant bail. Rather than being "special," our review of hundreds of extradition cases has shown that probable cause challenges are quite commonplace. And though they raise an issue that a

reviewing court must ultimately address, they are hardly special or unique in any material way.

Pres. Martinelli's second proposed special sub-circumstance is that he cannot be prosecuted because he has immunity. [D.E. 18 at 9-10]. Immunity is a defense Pres. Martinelli may raise if he is tried in Panama, but it is not relevant at this stage. "In an extradition proceeding, the government bears the burden of establishing extraditability, and consequently the government must show, among other things, that there is competent legal evidence establishing probable cause to believe that person named in the extradition request committed the charged offenses." *In re Extradition of Santos*, 473 F. Supp. 2d 1030, 1038 (C.D. Cal. 2006) (citing 18 U.S.C. §§ 3184, 3190) (other citations omitted). This Court, more likely than not, has enough evidence before it to show probable cause for Panama's request for extradition, Pres. Martinelli's arrest, and the detention of Pres. Martinelli, at least for the remainder of his extradition proceedings.

Pres. Martinelli's third proposed special sub-circumstance is that Panama has not produced an arrest warrant for an extraditable offense. [D.E. 18 at 10]. This argument fails because Panama issued a warrant for the provisional detention of Pres. Martinelli [D.E. 12-3] and because Panama filed a Request for Extradition and Arrest for Purposes of Extradition of Pres. Martinelli. [D.E. 13-1]. For now, this is certainly enough of a record to commence these proceedings. But this procedural challenge hardly constitutes special circumstances to justify bail.

Pres. Martinelli's fourth proposed special sub-circumstance is that a legal charge has not been properly issued against him. [D.E. 18 at 10-11]. This argument fails because the charges against Pres. Martinelli were described in detail in Panama's Request for Extradition and Arrest for Purposes of Extradition of Pres. Martinelli. [D.E. 13-1 at 15-25, ¶ 27]. Again, for now, this is enough and does not give rise to the type of special circumstances that *Wright* likely contemplated.

Pres. Martinelli's fifth proposed special sub-circumstance is that his alleged crimes do not qualify as extraditable offenses. Again, at this early stage, we find that there are colorable arguments that the charges filed against him in Panama *may* qualify as extraditable offenses, in whole or in part. Special circumstances do not flow from this challenge that remains pending at this point.

Pres. Martinelli's final proposed special sub-circumstance is that his alleged crimes are of a political character. We will pause to review this issue in more depth here.

> Traditionally, there have been two categories of political offenses: 'pure' and 'relative.' [*Ordinola v. Hackman*, 478 F.3d 588, 596 (4th Cir. 2007)]. 'Pure' political offenses include treason, sedition, and espionage. *Id.*; *see also Vo v. Benov*, 447 F.3d 1235, 1241 (9th Cir. 2006). 'Relative' political offenses include 'common crimes that are so intertwined with a political act that the offense itself becomes a political one.' *Ordinola*, 478 F.3d at 596.

*Meza v. United States Att'y Gen.*, 693 F.3d 1350, 1358-59 (11th Cir. 2012). "For this type of crime, we use the two-prong "incidence" test to decide whether a crime falls under the political offense exception." *Vo*, 447 F.3d at 1240 (internal citation omitted).

The relevant inquiry in addressing this issue is well established:

> Most American courts addressing 'relative' political offenses have developed a two-prong test to determine whether an offense is sufficiently political to fall within the exception. Known as 'the incidence test,' it asks whether (1) there was a violent political disturbance or uprising in the requesting country at the time of the alleged offense, and if so, (2) whether the alleged offense was incidental to or in the furtherance of the uprising.

*Ordinola*, 478 F.3d at 596-97 (citation omitted).

Our review of the current record shows that none of the crimes with which Pres. Martinelli is charged appear to fall within any relevant definition of "treason, espionage, or sedition." Yet, Pres. Martinelli asserts that "the four crimes listed in the Complaint sound in sedition." [D.E. 18 at 13]. Sedition is defined as "[a]n agreement, communication, or other preliminary activity aimed at inciting treason or some lesser commotion against public authority." *Sedition*, Black's Law Dictionary (10th ed. 2014). We preliminarily find that the charges in this case, primarily wiretapping and embezzlement, do not incite treason or at least are not proximately related to the incitement of treason in any way.

Therefore, the political character doctrine is likely not going to be an issue in this extradition proceeding. For now, at least, it certainly does not give rise to special circumstances with respect to bail.

## 2. *Nothing at This Stage Indicates a Protracted Proceeding.*

Pres. Martinelli's next proposed special circumstance is that his extradition proceeding will be protracted. [D.E. 18 at 14-15]. Pres. Martinelli provided four arguments as to why the extradition process will be lengthy. [D.E. 18 at 14-15].

First, he argued that the volume of materials requires "significant time to review and analyze . . . ." *Id.* at 14. But courts have repeatedly rejected this type of argument. For instance, the Southern District of New York rejected a similar argument in 2009. *See In re Extradition of Garcia*, 615 F. Supp. 2d 162, 167, 170, 175 (S.D.N.Y. 2009) (holding that the defendant did not demonstrate special circumstances, despite the extensive documentation in the case against him and his argument that the complexity of the charge against him will cause lengthy proceedings). The same analysis applies here.

Next, Pres. Martinelli stated his intentions to raise meritorious challenges to his extradition. [D.E. 18 at 14]. We do not doubt that intention and we are certainly prepared to review those challenges carefully. But, again, courts have often rejected that self-serving assessment for purposes of this analysis. *See, e.g., United States v. Glantz*, 1994 WL 168019, at *2-*3 (S.D.N.Y. Apr. 29, 1994) (ordering that the defendant be detained pending the extradition determination partly because the need to assist his attorney and the possible complexity and length of the extradition proceedings were not adequate bases for relief).

Pres. Martinelli argued further that he "will need time to track down and gather the evidence that will prove the falsity of the accusations." [D.E. 18 at 14]. A number of courts have rejected similar arguments vis-à-vis a bail determination. *See Matter of Extradition of Smyth*, 976 F.2d 1535, 1535-36 (9th Cir. 1992) (reversing the district court's order to grant the defendant's motion for bail partly because "[t]he need to consult with counsel, gather evidence and confer with

witnesses, although important, is not extraordinary; all incarcerated defendants need to do these things."); *Matter of Extradition of Russell*, 805 F.2d at 1217-18 (affirming the district court's holding that the defendant failed to show special circumstances partly because he had ample time to consult with his attorneys and because he did not need participate personally in their investigative efforts); *Matter of Perez-Cueva*, 2016 WL 884877, at *3 (C.D. Cal. Mar. 7, 2016) (holding that the defendant failed to show special circumstances justifying release on bail partly because "[t]he inability to assist counsel and appear at pending court proceedings are hardships faced by all incarcerated persons and do not constitute 'special circumstances' warranting release") (citation omitted); *In re Extradition of Boeyink*, 2004 WL 6074945, at *3 (E.D. Va. Jan. 28, 2004) (holding that "the need to consult with counsel, gather evidence and confer with witnesses" is not a special circumstance justifying bail).

Finally, Pres. Martinelli stated that his proceedings will be protracted because he intends to file a petition of habeas corpus and appeal if this Court orders his extradition.  [D.E. 18 at 14-15].  Though Pres. Martinelli is certainly entitled to raise any valid legal argument before the appropriate tribunal, similar arguments have also been rejected as a basis to find special circumstances.  *See, e.g., United States v. Kin-Hong*, 83 F.3d 523, 525 (1st Cir. 1996) (reversing the district court's order to grant the defendant's motion for bail partly because a potentially three-day extradition hearing was not unusually long and because the court did "not believe the normal passage of time inherent in the litigation process constitutes a 'special

circumstance'"); *Matter of Extradition of Antonowicz*, 2017 WL 1197855, at *3, *5 (C.D. Cal. Mar. 27, 2017) (holding that the defendant did not show special circumstances, although the time from his arrest to his extradition hearing could take as much as four months, as this timeframe is not "beyond what all defendants face in extradition") (also holding that the fact that the defendant could appeal after his extradition proceeding does not constitute a special circumstance because appealing "is a choice he will make and will control"); *Matter of Extradition of Drumm*, 150 F. Supp. 3d 92, 99 (D. Mass. 2015) (holding that the possibility of "post-extradition hearing litigation, such as appeals from any decisions . . . is too speculative a ground at this juncture to constitute a special circumstance justifying release"); *Extradition of Azizi*, 2014 WL 1995083, at *2-*3 (N.D. Cal. May 13, 2014) (holding that the defendant's argument that the number of charges against him will cause lengthy proceedings and that he might pursue years-long habeas corpus proceedings did not convincingly show a delay in his extradition proceedings); *Hababou v. Albright*, 82 F. Supp. 2d 347, 351-52 (D.N.J. 2000) (holding that a delay of at least one year in the defendant's domestic trial did not constitute a special circumstance).

In sum, we do not find here that the length of the anticipated extradition process in this case, real or imagined, warrants a finding of special circumstances sufficient to grant bail contrary to the presumption of detention.

### 3.  *Even if Bail Were Available in Panama, This Is Not a Special Circumstance for our Purposes.*

Pres. Martinelli's next proposed special circumstance is that bail is available in Panama for his offenses.  [D.E. 18 at 15].  Even if we assume, as we do, that this is correct, a number of courts have rejected similar arguments.  *See, e.g., Antonowicz*, 2017 WL 1197855, at *4-*5 (holding that the defendant did not show special circumstances partly because "eligibility for bail for a comparable crime committed in the United States does not present a special circumstance"); *Drumm v. McDonald*, 2016 WL 111411, at *4, *6 (D. Mass. Jan. 11, 2016) (affirming the Magistrate Judge's decision to deny bail partly because the bail practices of the demanding State are irrelevant: "[f]oreign bail practices should have no role in shaping the discharge by a United States court of its limited duties in adjudicating an extradition demand") (citation omitted); *In re Extradition of Gohir*, 2014 WL 2123402, at *12-*13 (D. Nev. May 21, 2014) (denying the defendant's motion for bail partly because "the availability of bail in the requesting country on the underyling [sic] offense is not a special circumstance," despite the holding of *Matter of Extradition of Nacif-Borge*, 829 F. Supp. 1210 (D. Nev. 1993)); *Azizi*, 2014 WL 1995083, at *2-*3 (denying the defendant's motion for bail partly because "the availability of bail in the requesting country is not a special circumstance"); *In re the Extradition of Kyung Joon Kim*, 2004 WL 5782517, at *2 (C.D. Cal. July 1, 2004) (noting that "[g]ranting an extraditee bail in the United States because the underlying offense is bailable in the foreign country is unworkable and would undermine the special circumstances requirement"); *In re Extradition of Orozco*, 268

F. Supp. 2d 1115, 1117 (D. Ariz. 2003) (holding that the defendant did not show special circumstances, although the criminal charge against him was a bailable offense in Mexico); *Matter of Extradition of Sutton*, 898 F. Supp. 691, 695 (E.D. Mo. 1995) (agreeing with the holdings of *Matter of Extradition of Rouvier*, 839 F. Supp. 537 (N.D. Ill. 1993) and *In re Extradition of Siegmund*, 887 F. Supp. 1383 (D. Nev. 1995), to hold that the defendant did not show special circumstances partly because "[t]he purpose of an international extradition proceeding is not to mirror the internal bail practices of the requesting country, but, rather, to deliver the extraditee to that country if the conditions for extradition are met") (internal quotations and citations omitted); *Siegmund*, 887 F. Supp. at 1386-87 (disagreeing with the holding of *Nacif-Borge*, 829 F. Supp. 1210, because forcing courts to review foreign laws to determine whether bail is appropriate "would be an undesirable practice: it might well be unworkable, and, if applied widely, it could eviscerate, at least with respect to requesting countries whose domestic practice, like our own, strongly favors bail, the doctrine set out by the Supreme Court that bail is the exception, not the rule, in international extradition cases").

Though there is some authority that runs counter to these decisions, *see Nacif-Borge*, 829 F. Supp. at 1210, our assessment of this record shows that the majority view is fully applicable here. No special circumstances exist on this basis. *See also Antonowicz*, 2017 WL 1197855, at *4 ("The parties' conflicting proof about how bail would be handled in Poland highlights how Antonowicz's theory presents

an unworkable task and one that does not address the primary goal of the extradition proceeding, which is to deliver the fugitive to the extraditing country.").

### 4. Panama Has Not Shown a Lack of Diplomatic Necessity.

Pres. Martinelli's next proposed special circumstance is that because the government did not file the Complaint until more than two years after he moved to Miami, Florida, Panama has shown a lack of diplomatic necessity. [D.E. 18 at 15]. We disagree, as in the case of *Matter of Extradition of Drumm*, where the court denied the defendant's Motion for Release on Bail Pending Extradition Proceedings partly because the defendant failed to show diplomatic necessity as a special circumstance. *See* 150 F. Supp. at 100. The court there held that Ireland did not demonstrate a lack of urgency or necessity in its request for the defendant's extradition, despite the fact that the underlying criminal charges against the defendant came around *seven* years earlier. *See id.* at 98-99. Further, the court explained that "it appears that Ireland has been actively investigating the case since 2009 and that the delay in charging Mr. Drumm was attributable, at least in part, to his own decision to relocate to the United States." *Id.*

A number of other courts have rejected arguments similar to Pres. Martinelli's contention concerning diplomatic necessity. *See Garcia*, 615 F. Supp. 2d at 171-72, 175 (denying the defendant's application for bail partly because he failed to show diplomatic necessity as a special circumstance, despite the fact that the Philippines charged him three years before commencing extradition proceedings formally); *United States v. De Loera*, 2006 WL 1518981, at *3-*4 (N.D. Ind. May 31,

2006) (ordering that the defendant be detained until further order partly because he failed to show special circumstances, despite that his warrant was issued approximately ten to eleven years before Mexico requested his extradition); *In re Extradition of Harrison*, 2004 WL 1145831, at *9 (S.D.N.Y. May 21, 2004) (denying the defendant's application for bail because he "failed to demonstrate the presence of special circumstances," because Belgium's delay in requesting his provisional arrest did not prolong his incarceration).

We find no special circumstance present in this record based upon this diplomatic necessity theory.

### 5. **Pres. Martinelli's Clean Criminal Record Is Not a Special Circumstance.**

Pres. Martinelli's next proposed special circumstance is that he has no criminal history. [D.E. 18 at 15]. While this Court does not dispute his assertion, we do not consider a clean criminal record to be a special circumstance. Pres. Martinelli cited *United States v. Taitz*, 130 F.R.D. 442 (S.D. Cal. 1990), to support his position. *Id.* But, *United States v. Snyder* provides a more persuasive analysis that distinguishes the facts of *Taitz*, and the same analysis from *Snyder* applies here. *See* 2013 WL 1364275, at *5 (D. Ariz. Apr. 3, 2013). Specifically:

> In *Taitz,* the court noted that the defendant had no prior record and was not charged with a crime of violence. *Taitz,* 130 F.R.D. at 446. Here, as in *Taitz,* Defendant is charged with a non-violent offense and the presentence report indicates that she has no criminal history.

> However, the court's decision to release the defendant in *Taitz* was based on several factors that are not present here, including: (1) the complexity of the case, which involved 434 counts of fraud and substantial questions as to whether the offenses were extraditable

> under the governing treating, (2) the delay of the extradition hearing, which would likely not take place for at least six months, (3) the defendant was allergic to the common substances in the food and to the laundry soap used in the correctional institution, (4) the correctional center lacked facilities and materials for defendant to practice his religion and (5) there was no diplomatic necessity to deny bail because under South African law, fraud is a bailable offense and defendant produced evidence that a South African court had released on bail a defendant facing extradition to the United States on similar charges. *Id.* at 445–47. Therefore, the decision in *Taitz* is distinguishable and does not support Defendant's argument that the nature of her offense and her lack of a criminal history are special circumstances that support her release.

*Id.* Based in part on this analysis, the court in *Snyder* held that the defendant failed to establish special circumstances and ordered that the defendant be detained pending further proceedings. *Id.* at *8-*9.

Further, in *Boeyink*, the court ordered that the defendant be detained pending an extradition hearing partly because the court found "no special circumstances sufficient to justify Boeyink's release on bail pending his extradition hearing." 2004 WL 6074945, at *3. The court noted that "[t]he fact that an accused is charged only with nonviolent, economic crimes is not a special circumstance justifying release on bail." *Id.*; *see also Azizi*, 2014 WL 1995083, at *2-*3 (finding no special circumstances because "nothing extraordinary" distinguished "the instant case from any other," despite the defendant's lack of a prior criminal record in the United States).

Our review of this case shows that no special circumstances exist based upon an otherwise clean criminal history. *See also Jimenez,* 314 F.2d at 649-53

(affirming denial of bail to former head of state who was not shown to have any prior criminal history in Venezuela or Florida).

### 6. *Pres. Martinelli's Age and Health Do Not Constitute Special Circumstances.*

Pres. Martinelli's next proposed special circumstance is that "prolonged detention will almost surely result in a serious deterioration of [his] health." [D.E. 18 at 16]. He argued that his health, age, recent surgery, medications, and the stress of detention warrant bail. *Id.* While this Court understands Pres. Martinelli's medical issues, we do not consider his age and health to constitute special circumstances. In *Gohir*, for instance, the defendant "referenced on multiple occasions that he is diabetic and will not be able to receive adequate treatment if detained." 2014 WL 2123402, at *12. Yet the court noted that "[t]here is nothing indicating that the detention facility is unable to meet Gohir's medical needs. Nor is there any indication that his health has deteriorated or that he has been unable to receive treatment during his detention." *Id.* The court denied the defendant's motion for bail, noting that "nothing extraordinary" distinguished the case and that there were no special circumstances. *Id.* at *13.

Similarly, in *Snyder*, the court found that the defendant "failed to establish special circumstances to warrant bail or release in the pending extradition proceedings" and ordered that the defendant be "detained pending further proceedings." 2013 WL 1364275, at *8-*9. That defendant had:

> a history of ovarian cancer that has been in remission since 2007. She reported to the pretrial services office that she started vomiting blood six months ago, but did not seek treatment because she does not have

health insurance. At the detention hearing, she reported that her condition has worsened during her recent detention.

Defendant's health issues do no not constitute a special circumstance. Defendant stated that her need for treatment is paramount, but she has not sought and is not currently receiving treatment. A lthough medical issues could qualify as special circumstances, Defendant has failed to prove a serious deterioration of health in this case. Defendant's health condition is concerning, but it is not a special circumstance that supports her release.

Furthermore, Defendant could obtain treatment for her health condition while incarcerated.

*Id.* at *8 (internal quotations and citation omitted).

In another recent case, *United States v. Latulippe*, the court ordered the defendant provisionally detained pending his extradition hearing. 2008 WL 2704230, at *2 (D.N.H. July 3, 2008). That defendant had been "seeking release based upon his deteriorating health due to stage 3 anal-rectal carcinoma . . . ." *Id.* at *1. In response to the defendant's request "to be released to seek the treatment of his choosing," the court explained:

This course of treatment, however, does not offer any certain cure that Mr. Latulippe cannot receive in custody. The fact that a particular treatment, available in some places, is not available to Mr. Latulippe during his detention does not create a special circumstance that would exempt him from the presumption of detention in this instance. As a ward of the United States Marshal, Mr. Latulippe is expected to receive reasonably necessary medical treatment for his cancer, which is being offered to him at the Wentworth–Douglas Hospital in Dover, New Hampshire, and which entails chemo-radiation and surgery.

Mr. Latulippe's physical condition, while serious, is insufficient to require this court to set conditions of release pending a formal request for extradition.

*Id.* The court ultimately concluded that the defendant did not present a special circumstance that would lead to his release on bail. *Id.*

By comparison with some of these cases, even at his advanced age Pres. Martinelli is a model of health. But even if he was not, special circumstances do not exist for these types of issues. *See also United States v. Nolan*, 2009 WL 4544699, at *3 (N.D. Ill. Dec. 1, 2009) (noting that the deterioration of the defendant's health was not a special circumstance, despite claims of "serious and dangerous mental health consequences" and ongoing treatment for skin cancer) (internal quotations omitted); *Bolanos v. Avila*, 2009 WL 3151328, at *4 (D.N.J. Sept. 24, 2009) (denying the defendant's petition and request for bail partly because "[t]he mere availability of a better, private form of medical treatment is not sufficient to overcome the presumption against bail") (citation omitted); *Kyung Joon Kim*, 2004 WL 5782517, at *4-6 (holding that the defendant's release on bail was not justified because there were no special circumstances, despite the defendant's back problem, which required him to take daily anti-inflammatory medication and could "be addressed adequately while incarcerated, [as] his ailments [did] not require immediate attention, unavailable in custody, to prevent the deterioration of his health"); *Glantz*, 1994 WL 168019, at *2-*3 (holding that the defendant "will be detained pending the extradition determination," despite his "severe ailment for which he is taking medication," because "there is no suggestion that the prison facility in which he is housed is unable to provide the necessary medication or to monitor his condition") (internal citation omitted); *Matter of Extradition of Hamilton-Byrne*, 831

F. Supp. 287, 290-91 (S.D.N.Y. 1993) (noting that the defendants' health problems could be dealt with while in custody and that "[w]ere health problems a basis for release, both actual and feigned illnesses could rapidly empty custodial facilities"); *In re Klein*, 46 F.2d 85, 85 (S.D.N.Y. 1930) (noting that the discomfort of incarceration was "an unavoidable incident" and that "[o]ne who voluntarily leaves his home shores for ours is subject alike to the disadvantages and the advantages that ensue from any applicable provision of a treaty between the two states concerned").

> ### 7. *The Potential Political Influence on Panama's Decision to Charge Pres. Martinelli and Request his Extradition Are Not Special Circumstances. But his own Status May be.*

Pres. Martinelli's final proposed special circumstance is that the charges against him are of a "transparently political nature." [D.E. 18 at 16]. Pres. Martinelli cited to no cases to support this argument. *See id.* at 16-17. Even if the charges against him were politically motivated, they may still be based on facts and supported by evidence. Panama's motive for charging Pres. Martinelli and requesting his extradition from the United States is not a special circumstance in this case. This conclusion is supported by *Garcia*, a case in which the court noted that the defendant was "not entitled to bail on the theory that the need to conduct an inquiry into whether the charges against him [were] 'political offenses' [was] a special circumstance." 615 F. Supp. 2d at 170. The court continued:

> It is difficult to see how the alleged receipt of $6 million in bribes could be considered a "political" crime. In any event, Garcia cites no authority, nor does there appear to be any Second Circuit case law suggesting that a person charged with an alleged political offense is

entitled to special consideration by being granted bail pending an extradition hearing. There also is no evidence before the Court suggesting that the charged crimes are political, or that the determination of that issue will be unusually time-consuming. Garcia therefore is not entitled to bail on the theory that the Philippines extradition request seeks extradition for a political crime.

*Id.*

Though this particular argument does not have persuasive effect on the bail analysis, it does touch upon one aspect of this case that arguably is so unusual to give rise to special considerations. That is the fact that Pres. Martinelli is a former head of state of a sovereign nation with long-running relations with the United States. This type of case does not come around often. Indeed, the parties and the Court have identified only one such case, *Jimenez* that we discussed earlier, where a head of state was, for a brief period, granted bail by a judge in our own district. We can all agree that the unique nature of such an extradition gives rise to special considerations. And no doubt the State Department engaged in that very same analysis in deciding whether or not to approve Panama's extradition request in this case.

We do not have the benefit of the district court's analysis in *Jimenez* as to the reasons why he initially granted bail to that defendant. We only know from the appellate decisions that affirmed the district judge that bail was initially granted, but then revoked after the extradition process concluded in the original reviewing court. And we know that the appellate court affirmed both determinations. We thus can only speculate, but with some level of confidence, that the former status of

the defendant as a head of state of a neighbor nation –Venezuela – may have played some role in the court's bond analysis.

For our part, we find that this unique case does give rise, at least in theory, to the type of "special circumstance" that *Wright* may have been envisioning. The extraordinary nature of such an extradition request implicates significant foreign relations, comity, and international law issues. While those issues are hashed out, it is not inconceivable that a defendant in Pres. Martinelli's shoes would be granted bail solely on this basis. So we will proceed with the risk of flight analysis to determine if we should grant this extraordinary Defendant special consideration. But we do so recognizing that, but for that unique aspect of the case, the record here does not present any traditional special circumstances that would otherwise justify bail pending final adjudication.

### B.    ***Pres. Martinelli Poses a Serious Risk of Flight.***

"The case law . . . reflects an inconsistency among courts in their analysis of flight risk in relation to the 'special circumstances' inquiry. Most courts treat flight risk as a separate, independent factor from the special circumstances analysis." *In re Garcia,* 761 F. Supp. 2d at 472. The courts that examine risk of flight and special circumstances separately thus "require the potential extraditee to establish the following two factors before [they] can grant bail in a foreign extradition case: (1) 'special circumstances' exist in their particular case; and (2) they are not a flight risk or a danger to the community." *Id.* at 472–73.

The majority of cases that have examined this question, especially those in our Circuit, have concluded that the risk of flight analysis is a separate inquiry. *See, e.g., In re Extradition of Shaw,* 2015 WL 521183, at *9 (Matthewman, Mag.J.). We follow this approach, and consider whether Pres. Martinelli has met his burden of persuasion, at least on a preponderance basis, to show that he does not pose a serious risk of flight to allow for bail in this case.

In evaluating risk of flight in the extradition context, courts have considered a defendant's financial means, foreign connections, age, and the seriousness of the offenses. *See, e.g., United States v. Madoff*, 316 F. App'x 58, 59 (2d Cir. 2009) (holding that the district court did not err in concluding that the defendant's age and length of his potential sentence were incentives to flee); *Gohir*, 2014 WL 2123402, at *13 (holding that the defendant was a risk of flight because "he is a man of considerable means, with access to substantial resources"); *Beresford-Redman*, 753 F. Supp. 2d at 1091 (noting that "a well-educated and sophisticated individual, facing serious charges in a foreign country . . . has both incentive and ability to flee").

After reviewing the record in this case, we find that the weight of the evidence against Pres. Martinelli pertaining to his wealth, foreign connections, age, and the seriousness of his offenses is substantial. The weight of the evidence is undoubtedly sufficient to support pretrial detention in this case, especially given Pres. Martinelli's heavy burden to show why bail should be granted in an extradition case.

### 1. Pres. Martinelli is a Serious Risk of Flight Because He Could Use His Reported Wealth to Flee the Country and Sustain Himself Abroad.

There is little dispute here that Pres. Martinelli is an extremely wealthy individual. [D.E. 15 at 20]. He reportedly owns a plane, a yacht, helicopters, and the Super 99 supermarket chain in Panama, which generates over $700 million in revenue annually. *See id.* This Court finds that Pres. Martinelli could easily use his accumulated wealth to sustain himself and his family indefinitely after fleeing to another country. Although Pres. Martinelli offered an extraordinary bond package [D.E. 18 at 18-19] in lieu of detention, courts presented with similar evidence have continuously held that defendants with financial means to flee pose a serious risk of flight. *See, e.g.*, *Gohir*, 2014 WL 2123402, at *13 (holding that the defendant was a risk of flight because "he is a man of considerable means, with access to substantial resources"); *Azizi*, 2014 WL 1995083, at *3 (holding that the defendant posed a risk of flight partly because he was "a man of considerable means, with access to substantial resources," even though his family was willing to post several properties as security for his bond); *Matter of Extradition of Ye Gon*, 2009 WL 3336092, at *4 (D.D.C. Oct. 15, 2009) (noting that "any individual who is facing serious jail time if convicted and who has at his disposal over $200 million U.S. dollars in cash has both the motive and means to flee . . . ."); *Hababou*, 82 F. Supp. 2d at 352 (finding a risk of flight "based on the seriousness of the domestic charges, and based on petitioner's financial wherewithal and potential international safe harbors[,]" which present an "enormous incentive and opportunity to flee").

The record in this case fully supports the Court's finding that, based on his overwhelming financial wherewithal and his substantial ties to many possible international destinations, Pres. Martinelli poses such a risk of flight that bail should not be contemplated for an extradition proceeding notwithstanding the special circumstance involved in the extradition of a former head of state.

### 2. Pres. Martinelli is a Serious Risk of Flight Because He Could Use His Reported Foreign Connections to Establish Himself Abroad.

According to the government's Request for Detention, Pres. Martinelli has multiple passports and significant contacts with foreign countries. [D.E. 15 at 21]. Courts have held that significant contacts with foreign countries are an important factor in determining one's risk of flight. *See, e.g., Matter of Tehrani*, 2016 WL 3456971, at *2 (C.D. Cal. June 17, 2016) (holding that the defendant posed a risk of flight because he left his country after a search warrant was issued at his residence and because he had wide geographic ties); *Gohir*, 2014 WL 2123402, at *13 (noting that significant ties to other countries help establish a risk of flight); *Azizi*, 2014 WL 1995083, at *3 (noting that significant ties to other countries help establish a risk of flight); *Ye Gon*, 2009 WL 3336092, at *4 (noting that the respondent's personal and professional ties to other countries helped establish his risk of flight); *Hababou*, 82 F. Supp. 2d at 352 (noting that significant ties to other countries help establish a risk of flight).

All these considerations are firmly present in this case. Pres. Martinelli's unique political status may give rise to special circumstance considerations. But at

the same time his equally unique financial and international status is also what concerns the Court the most about granting bail in this case. His professional ties to many countries – including Brazil where extradition is often difficult – present significant obstacles to bail in this case.

### 3. Pres. Martinelli is a Serious Risk of Flight Because He Could Spend the Remainder of His Life in Prison if He Is Convicted in Panama.

Pres. Martinelli's age and the seriousness of his offenses also materially contribute to his high risk of flight. Pres. Martinelli is sixty-six years old and faces a potential twenty-one-year sentence in Panama. [D.E. 15 at 21]. Courts have considered both age and the seriousness of the offenses as incentives to flee. *See, e.g.*, *Madoff*, 316 F. App'x at 59 (holding that the district court did not err in concluding that the defendant's age and the length of his potential sentence are incentives to flee); *Duran v. United States*, 36 F. Supp. 2d 622, 628 (S.D.N.Y. 1999) (noting that the petitioner's term of imprisonment, which may outlast his remaining years of life, is a significant incentive to flee).

Though it is also entirely possible that the government's threatened twenty-one-year sentence is exaggerated, especially considering the fact that Pres. Martinelli may ultimately only end up being extradited on less than all the charges filed against him in Panama, any period of incarceration is a grave one, especially given his age and his status. That consideration certainly supports the government's position in this case.

### 4. *Pres. Martinelli Remains a Serious Risk of Flight, Despite His Ties to our Community.*

Pres. Martinelli argues that his strong ties the community – his family, his friends, and political supporters – prove that he is not a flight risk. [D.E. 18 at 18]. The problem is that the relevant caselaw runs counter to these same arguments. *See, e.g.*, *Snyder*, 2013 WL 1364275, at *3 (D. Ariz. Apr. 3, 2013) (holding that the defendant's ties to the community, including owning a home, caring for her eleven-year-old step daughter, and being an American citizen, were not enough to overcome her risk of flight); *Duran*, 36 F. Supp. 2d at 628 (holding that the defendant posed a serious flight risk, despite his significant ties to the community).

Though he certainly has a substantial connection to South Florida, and owns property and assets that could in theory be secured here, that connection is overwhelmed by his far greater and predominate ties to many other parts of the world. Even though we have considered the possibility of bond in this case based upon his unique status as a former head of state, that consideration runs headlong against a series of tangible risks of flight that may allow and incentivize Pres. Martinelli to flee from this case and seek asylum elsewhere. And though we have not come close to determining that he will, in fact, be extradited for these charges, we have an ample record to find that we should not relinquish control over him until that process has been finalized.

Based upon the presumption that applies here, and the overwhelming risk of flight that exists, we have no choice but to grant the government's motion for detention and deny Pres. Martinelli's motion for release. We have no intention of

allowing our nation's treaty obligations to suffer from an errant bail determination over an individual with the means, motive, and power to abandon his defense of this case. Pres. Martinelli believes that the judicial proceeding in Panama is a witch-hunt initiated by his political adversaries. He questions the possibility of a fair trial in Panama (even though he likely appointed many of the prosecutors and judges who may be involved in the case). And he certainly denies the factual bases of the charges. The difficulty the Court faces is that these strongly-held beliefs may also prove to be tempting rationales to avoid prosecution altogether. Regardless of the cost to himself or his family, Pres. Martinelli may choose to seek asylum elsewhere and abandon his defense in Panama. If successful, law enforcement authorities in Panama – who may be equally sincere in their belief that Pres. Martinelli engaged in unlawful conduct – may then be deprived of the opportunity to prove their case.

This dilemma posed by the circumstances involved in this case presents too great a risk to the Court and to our Executive Branch. Our Nation's obligations arising from multiple treaties with a neighbor in our region of the world are paramount. Duly enacted treaties are, after all, the law of the land and fully enforceable under the Supremacy Clause. *See, e.g., Sanchez-Llamas v. Oregon,* 548 U.S. 331, 346-47 (2006) ("And where a treaty provides for a particular judicial remedy, there is no issue of intruding on the constitutional prerogatives of the States or the other federal branches. Courts must apply the remedy as a requirement of federal law.").

Further, from a practical perspective, the enforcement of extradition treaties is one that our Nation takes very seriously. We undoubtedly invoke extradition treaties for cases pending in our jurisdictions far more than we are called upon to extradite persons wanted in foreign countries. Thus, our Executive Branch has a vested interest in enforcing our own treaty obligations for fear that other treaty partners will refrain from doing so in the future. And a difficult but necessary measure in carrying out that responsibility is to secure a wanted individual and surrender him or her to the foreign jurisdiction. That is our first and foremost obligation under the 1904 Treaty with Panama as well as all other similar extradition treaties that we are bound to. Consequently, we are hesitant to release this or any other extraditable defendant if it unduly risks that responsibility once the Executive Branch has initiated the extradition process. *See also Munaf v. Geren,* 553 U.S. 674, 702 (2008) ("The Judiciary is not suited to second-guess such determinations—determinations that would require federal courts to pass judgment on foreign justice systems and undermine the Government's ability to speak with one voice in this area. *See* The Federalist No. 42, p. 279 (J. Cooke ed. 1961) (J. Madison) ("If we are to be one nation in any respect, it clearly ought to be in respect to other nations").")'; *Wright,* 190 U.S. at 62 ("The enforcement of the bond, if forfeited, would hardly meet the international demand; and the regaining of the custody of the accused obviously would be surrounded with serious embarrassment.").

### III. CONCLUSION

For the foregoing reasons, it is hereby **ORDERED AND ADJUDGED**:

A.    The United States' Motion for Detention of Defendant Ricardo Alberto Martinelli Berrocal [D.E. 15] is **GRANTED**.

B.    Defendant's Motion and Supplemental Motions For Release on Bail [D.E. 18, 26, 36] are **DENIED**.

C.    Defendant shall remain in the custody of the United States Marshal pending further Order of the Court.

D.    Absent agreement of the parties otherwise, a final extradition hearing in this matter shall be expedited and set for July 25, 2017, at 9:00 a.m., United States Courthouse, James Lawrence King Bldg., 99 N.E. 4th Street, Courtroom 10-5, Miami, Florida.


*/s/ Edwin G. Torres*          
EDWIN G. TORRES
United States Magistrate Judge